# EXHIBIT B

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

|  |  |
|---|---|
| **CAPITAL RAIL CONSTRUCTORS,**<br>a Joint Venture<br><br>**7500 Old Georgetown Road**<br>**Bethesda, Montgomery County,**<br>**Maryland 20810**<br><br>    **Plaintiff,**<br><br>v.<br><br>**WESTERN SURETY COMPANY**<br><br>**101 S. Reid Street, Suite 300**<br>**Sioux Falls, South Dakota 57103**<br><br>    **SERVE:**<br><br>    **Maryland Insurance**<br>    **Administration**<br>    **200 S. Paul Place, Suite 2700**<br>    **Baltimore, MD 21202**<br><br>    **Defendant.** | Case No. 8:16-cv-01345 |

## <ins>AMENDED</ins> COMPLAINT

Plaintiff Capital Rail Constructors, a Joint Venture ("CRC") hereby files this <ins>Amended</ins> Complaint against Defendant Western Surety Company ("Western" or "Surety") and in support thereof states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff CRC is a Joint Venture organized under the laws of Virginia with its principal place of business located at 7500 Old Georgetown Road, Bethesda, Maryland 20814. The members of CRC are corporate entities that are directly, or through their members,

organized under the laws of and/or with principal places of business located in states other than South Dakota and, therefore, diversity exists between CRC and Western for the purposes of 28 U.S.C. § 1332. CRC was formed to act as the design-build general contractor on Phase II of the Dulles Corridor Metrorail Project.

2.      Upon information and belief, Defendant Western is a South Dakota corporation in the business of issuing surety bonds with its principal place of business located at 101 S. Reid Street, Suite 300, Sioux Falls, South Dakota 57103.  Western also operates an office located at 9554 Greenspring Drive, Suite 450, Timonium, Maryland 21093.

3.      This Court has jurisdiction under 28 U.S.C. § 1332, as this is a civil action between a citizen of a foreign state and a citizen of a state, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue is proper in this District under 40 U.S.C. § 3133(b)(3), as it is the District in which Defendant maintains an office and, additionally, because the Subcontract referenced to and made a part of the Performance Bond issued by Defendant Western states that the Courts of Maryland shall have sole and exclusive jurisdiction.

## BACKGROUND

### Subcontract and Payment and Performance Bonds

5.      By contract dated May 14, 2013, the Metropolitan Washington Airports Authority ("Owner" or "MWAA") entered into a Contract with CRC for the design and construction of the Dulles Corridor Metrorail Project, Phase II ("Project").

6.      CRC and Midasco, LLC ("Midasco") entered into a Subcontract Agreement dated October 24, 2014 for Midasco to perform certain civil construction work for the construction of

the Project ("Subcontract").  A true and correct copy of the Subcontract is attached as Exhibit 1 and incorporated herein.

7. Pursuant to the requirements of the Subcontract, Midasco provided a performance bond (Bond No. 929597387) to secure Midasco's performance of work that named Western as Surety, CRC as Obligee and Midasco as Principal ("Performance Bond").  The Performance Bond, which was executed and sealed by Midasco and Western, was in the penal sum of $21,645,000.  A true and correct copy of the Performance Bond is attached as Exhibit 2 and incorporated herein.

8. The Performance Bond stated in part that:

> If the above bounded Principal shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of said Subcontract within the time provided therein … and shall well and truly perform all undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract … and shall indemnify and save harmless said Obligee [CRC] of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee [CRC] may sustain by reason of failure so to do, then this obligation shall be null and void, otherwise it shall remain in full force and effect.

9. The Performance Bond acknowledged that Principal Midasco had entered into a written Subcontract dated October 21, 2014 with CRC and further stated that the "Subcontract is hereby referred to and made a part hereof."

10. Also pursuant to the requirements of the Subcontract, Midasco provided a payment bond (Bond No. 929597387) that named Western as Surety, CRC as Obligee and Midasco as Principal ("Payment Bond").  The Payment Bond, which was executed and sealed by Midasco and Western, was in the penal sum of $21,645,000.  A true and correct copy of the Payment Bond is attached as Exhibit 4 and incorporated herein.

11. The Payment Bond stated in part that:

> [I]f the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

12. The Payment Bond further stated in part that:

> The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee [CRC], and that such persons may maintain independent actions upon this Bond in their own names.

~~10.~~13. Pursuant to the Subcontract, Midasco was obligated to, among other things:

> Perform all work and shall furnish all supervision, labor, materials, plant, scaffolding, tools, equipment, supplies and all other things necessary for the construction and completion of work described in Exhibit B and work incidental thereto, in strict accordance and full compliance with the terms of the Contract Documents (which are hereby incorporated by reference) and this Subcontract and to the satisfaction of CRC and the Owner.

~~11.~~14. Subcontract Paragraph 4(g) provided, in part, that:

> CRC may withhold amounts otherwise due under this Subcontract or any other agreement between the Parties to cover CRC's reasonable estimate of any costs or liability CRC has incurred or may incur for which Subcontractor may be responsible under this Subcontract or any other agreement between the Parties.

~~12.~~15. Subcontract Paragraph 6(a) provided that:

> Subcontractor hereby assumes sole responsibility and liability for all work, supervision, labor and materials provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by Subcontractor until final acceptance of work by the Owner. In the event of any loss, damage or destruction thereof from any cause, Subcontractor shall be liable therefor, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost.

~~13.~~16. Subcontract Paragraph 6(b) provided, in part, that:

> Subcontractor shall be liable to CRC for all costs CRC incurs as a result of Subcontractor's failure to perform this Subcontract in accordance with its terms. Subcontractor's failure to perform shall include the failure of its lower-tier subcontractors to perform. Subcontractor's liability shall include but not be limited to (1) damages and other delay costs payable by CRC to the Owner; (2) CRC's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; … (5) excess reprocurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs.

~~14.~~17.  Subcontract Paragraph 9(d) provided, in pertinent part, that:

> If Subcontractor considers any action or inaction by CRC other than a formal change order to be a change, it shall so notify CRC within three (3) days of said action or inaction and seek a confirmation from CRC. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

~~15.~~18.  Subcontract Paragraph 10(a) provided, in part, that:

> If, in the opinion of CRC, Subcontractor shall at any time (1) refuse or fail to provide sufficiently properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the work according to CRC's current schedule, (3) cause, by any action or omission, the stoppage of delay of or interference with the work of CRC or any other contractor or subcontractor, (4) fail to comply with any provision of this Subcontract or the Contract Documents … then, after serving three (3) days' written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, CRC, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to CRC for the cost thereof, [or] (ii) terminate for default Subcontractor's performance of all or a part of the Subcontract work …  In the event of termination for default, CRC may, at its option, (a) enter on the premises and take possession, for the purpose of completing the work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the work by whatever method CRC may deem expedient …

19.  Subcontract Paragraph 22(a) and 22(b) provide, in part, that:

> Subcontractor shall be bound by, and, at its own cost shall comply with all Federal, state and local laws, codes, ordinances and regulations applicable to this Subcontract and the performance of the work hereunder whether by reason of general law or by reason of provisions in the Contract Documents …
>
> . . .
>
> Specifically and without limitation, Subcontractor and all employees and agents thereof shall comply with the applicable requirements issued pursuant to the Occupational Safety and Health Act of 1970, as amended, and all other applicable health and safety laws and regulations, and all laws and regulations applicable to the hiring of aliens.

## MIDASCO PERFORMANCE

20.  On April 16, 2015, CRC directed Midasco to proceed with work in accordance with the latest update of the Project Schedule and a Rolling Baseline Update ("Schedule"). The Schedule had been developed with Midasco's direct input on durations of work activities in Midasco's scope of work.

21.  In the months that followed the issuance of the Schedule and Midasco's direction to proceed, Midasco failed to provide the appropriate crews and manpower to support the Schedule. Many of the areas of work where Midasco had been scheduled to work remained untouched. Midasco failed to meet the production rates discussed and agreed upon by Midasco when developing the Schedule with CRC.

22.  Midasco caused numerous safety incidents that slowed and at times even stopped production of Midasco's work crews.

23.  In order to minimize delays caused by Midasco's failure to perform in accordance with the Schedule, CRC reviewed the resources available and directed Midasco to perform in the critical areas of its work.

21 24.  Based on Midasco's failure to provide adequate manpower to the Project and perform work as required, the Schedule was in a state of perpetual flux.  Midasco's lack of manpower and inadequate rate of progress on the Project made it impossible for CRC to accurately plan its work.

22 25.  On or about July 20, 2015, CRC issued a 3-Day Notice pursuant to Section 10(a) of the Subcontract based on Midasco's failure to support the Schedule in a timely manner due, in part, to Midasco's failure to provide sufficient manpower or adequate supervision or materials on the Project.  Midasco was given 3 calendar days to cure these breaches of the Subcontract.  A copy of the 3-Day Notice was also sent to Western.

23 26.  The 3-Day Notice was followed by numerous meetings between Midasco and CRC discussing Midasco's performance.  After expiration of three days, CRC advised Midasco that its breaches had not been cured.  CRC advised Midasco that it would defer taking any actions permitted by Section 10 of the Subcontract at that time, and would attempt to work with Midasco to create a mutually agreeable partial 90-day recovery schedule that would be developed with express input from Midasco as to the duration of Midasco's work activities and its full understanding of the sequence of work required.

24 27.  On October 28, 2015, CRC issued a Notice of Default to Midasco, which was also sent to Western.  CRC's Notice of Default stated, in part, that:

> Midasco's failure to perform in accordance with the Project Schedule continues – Midasco has already fallen behind the October 1 CPM Schedule Update …. Midasco's ongoing failure to proceed has been the result of its inability to properly staff the Project from the beginning.
>
> . . .
>
> Midasco has also failed to install work in accordance with the Contract Documents.  Currently, Midasco has more open Non-

> Conformances than any other subcontractor on the Project site. These quality issues, combined with Midasco's numerous safety violations and failure to comply with OSHA and Project safety standards for excavation and trenching, have further impacted progress.
>
> . . .
>
> CRC notifies Midasco that it is in default of its obligations under the subcontract. In accordance with Article 10 of the subcontract, CRC will take steps to overcome the condition caused by Midasco's default. Pursuant to Article 10, Midasco is responsible for the cost of these efforts.
>
> . . .
>
> Specifically, CRC will supplement Midasco's efforts on this Project in order to mitigate the impact of default. CRC currently plans to supplement Midasco's efforts …

~~25.~~ 28.  CRC's October 28, 2015 Notice of Default to Midasco, with a copy to Western, stated that Midasco's failures of performance had impacted CRC's ability to accurately schedule the work, had resulted in potential claims to CRC from other subcontractors, and had caused actual impacts on CRC's performance, including additional costs of administration, additional management costs to plan and manage Midasco's work, and the need to supplement Midasco's performance. The letter stated that, based on Midasco's default of its obligations under the subcontract, CRC was going to supplement Midasco's efforts in specific areas of the Project in order to mitigate the impact of that default. CRC requested a meeting with Midasco and Western to discuss the matter.

~~26.~~ 29.  Subsequently, representatives from Midasco and Western met with CRC on site and Midasco's performance failures and breaches of the Subcontract Agreement were discussed and reviewed with Midasco and Western.

27.30.  Despite its clear obligations under the Performance Bond, Western incorrectly took the position that the bond obligations of Western had not been invoked.  CRC advised Western that the bond obligations of the Surety had been properly invoked and that the Surety was liable for all costs and fees associated with supplementation and performance of Midasco's Subcontract work at issue to the extent that unpaid Subcontract amounts do not cover all costs incurred.

31.     CRC subsequently provided a notice to Midasco and Western of additional supplementation of Midasco's work at specific locations on the Project.

32.     CRC supplemented Midasco's work by supplying labor and materials in the prosecution of Midasco's work as provided for in the Subcontract.  CRC contracted with Willbros T&D Services, LLC ("Willbros") to provide labor and materials for 34.5kV ductbank work from the Herndon to Reston portions of the Project (MHE.11 to MHE.20).  CRC contracted M.C. Dean, Inc. to provide labor and materials for waysides work at TPSS 13.

28.33.  Midasco's deficient performance and lack of supervision, and the need to supplement Midasco's work, resulted in CRC being required to provide labor to supervise Midasco's prosecution of its work and to supervise the supplemental work.

29.34.  On February 8, 2016, Midasco issued correspondence titled "Termination of Subcontract by Midasco Due to Material Breach by CRC."  Midasco's correspondence expressed an intent to terminate the Subcontract based primarily on CRC's decision to supplement Midasco's performance on the Project.

30.35.  On February 9, 2016, CRC issued a response titled "CRC Response to Midasco's February 8 Letter and 3-Day Cure Notice."  CRC advised that it is clear that Midasco's goal was to abandon work and that the issues raised in Midasco's February 8, 2016 letter did not represent

material breaches that would justify abandonment of the work.  CRC noted that the provisions of the Subcontract, including Section 11(a), addressed procedures which were to be followed by Midasco, without interruption, deficiency, or delay to the work should Midasco have any disputes.  CRC stated that "because abandonment of the work is not a right that Midasco has under the Subcontract or applicable law, CRC considers Midasco's stated intent to abandon its work a material breach of the Subcontract as set forth in Section 10 of the Subcontract."  Although not required, CRC stated its correspondence should be considered a 3-Day written notice of Midasco's obligation to cure its material breach, or CRC would exercise all rights under Section 10 of the Subcontract to terminate Midasco for default.  Western was copied on CRC's February 9, 2016 correspondence.  A true and correct copy of CRC's February 9, 2016 correspondence is attached as Exhibit 3 and incorporated herein.

　　　31.36.  By letter dated February 12, 2016, CRC provided a "Notice of Default of Midasco, LLC" to Midasco and Western.  As of that date, Midasco had not taken any steps to cure its breaches and had not communicated its intent to cure its breaches with CRC.  Midasco had started to remove materials and equipment from the Project, which was in direct contradiction to CRC's February 9 Cure Notice and a February 10 CRC letter directing Midasco not to remove any more materials or equipment from the site.  The correspondence notified Midasco and Western that Midasco was terminated for default.

　　　32.37.  As a result of Midasco's default and CRC's termination of Midasco for that default, CRC had to take steps to complete Midasco's scope of work.  CRC supplied and continues to supply engaged other contractors to perform labor and materials for the prosecution of the remaining work provided for in Midasco's SubcontractMidasco's scope of work.  In certain cases, CRC entered into time and materials agreements with replacement subcontractors

to provide labor and materials in order to avoid Project delay or other impacts. In other cases, where feasible, CRC obtained competitive bids for labor, materials, and other requirements necessary for the completion of Midasco's scope of work.

33.38.  CRC providesd Midasco and its Surety with regular updates of its efforts to provide labor and materials to complete Midasco's scope of work, which continues to date.

34.39.  To date, CRC has incurred costs, including but not limited to labor, materials, and supervision costs, directly resulting from Midasco's default of its subcontract obligations, including administrative costs associated with monitoring and assisting Midasco in the performance of its work, costs to supplement Midasco's performance prior to termination, additional management costs associated with overseeing Midasco's work, increased costs for maintenance of traffic, surveying and inspection during extended durations of Midasco's performance, costs associated with identifying and engaging replacement subcontractors after Midasco's default, additional scheduling costs associated with multiple replacement subcontractors as a result of Midasco's default, and costs of repairing defective work performed by Midasco but not discovered until after its termination for default. In addition, CRC has been damaged by paying unit rates to replacement subcontractors that cannot be reimbursed by the owner of the Project because CRC is paid based on a schedule of values that is based on unit rates in the Midasco subcontract.

35.40.  While Western engaged a consultant to investigate the situation, Western has refused to fund any of the costs associated with Midasco's default. Western has refused to attend regular meetings requested to address the completion of Midasco's scope of work and the costs incurred by CRC in doing so. To the contrary, Western has taken the position that it has no obligation to fund any of CRC's costs and, instead, CRC should complete the entire scope of

work and Western will then decide whether it has any obligation to pay any additional costs and whether CRC has properly mitigated the cost of completion.

## COUNT I
### (DECLARATORY JUDGMENT ON PERFORMANCE BOND – 28 U.S.C. § 2201)

36.41.  Paragraphs 1 through 4035 are incorporated by reference as if set forth in full herein.

37.42.  CRC has performed all covenants, conditions and agreements in the Subcontract according to their true intent and meaning and in the time and manner specified and did not fail to fulfill any material obligation of the Subcontract.

38.43.  Midasco, the Principal named on the Performance Bond issued by Western, was properly declared in default based on its material breaches of the Subcontract, which include, *inter alia*, those set forth herein.  CRC has properly and justifiably supplemented Midasco's work forces and terminated Midasco's Subcontract.  Pursuant to the terms of the Subcontract that is incorporated into the Performance Bond, *inter alia*, CRC, itself or through others, is completing the Subcontract work by the methods CRC has deemed most expedient. As a result of the costs incurred, or to be incurred by CRC, Western is liable for losses, damages and expenses, including costs and attorneys' fees, over and above the Subcontract balance.

39.44.  CRC has requested Western to cooperate, participate in, and compensate CRC for the completion of Midasco's work, but Western has failed and refused to do so.

40.45.  Based on the foregoing, an actual and justiciable controversy between CRC and Western involving the Performance Bond has arisen and now exists.  CRC desires a judicial declaration that:

    i.    CRC has made a timely and proper claim against the Performance Bond;

    ii.    Western's obligation(s) under the Performance Bond have been invoked;

     iii.    Western has materially breached the Performance Bond; and

     iv.    Western is liable for all CRC losses, damages and expenses, including costs and attorneys' fees, as a result of Midasco's material breaches, default and termination of the Subcontract requiring CRC's supplementation of Midasco's work forces and completion of Midasco's Subcontract work.

46.    The requested declaratory relief (i) would resolve the uncertainty regarding the parties' rights in relation to the Performance Bond; (ii) would resolve the corresponding controversies; (iii) would promote judicial efficiency; and (iv) very likely would avoid or significantly reduce judicial resources to address disputes between the parties herein.

## COUNT II
## (DECLARATORY JUDGMENT ON PAYMENT BOND – 28 U.S.C. § 2201)

47.    Paragraphs 1 through 40 are incorporated by reference as if set forth in full herein.

48.    CRC has performed all covenants, conditions and agreements in the Subcontract according to their true intent and meaning and in the time and manner specified and did not fail to fulfill any material obligation of the Subcontract.

49.    Midasco, the Principal named on the Payment Bond issued by Western, was properly declared in default based on its material breaches of the Subcontract, which include, *inter alia*, those set forth herein. CRC properly and justifiably supplemented Midasco's work forces by providing labor and materials and terminated Midasco's Subcontract. Pursuant to the terms of the Subcontract that is incorporated into the Payment Bond, *inter alia*, CRC, itself or through others, is performing the Subcontract work by the methods CRC has deemed most expedient. As a result of the costs incurred, or to be incurred by CRC, Western is liable for the costs incurred by CRC in providing labor and materials under the Subcontract.

50.     CRC has requested Western to cooperate, participate in, and compensate CRC for the supplementation and/or completion of Midasco's work, but Western has failed and refused to do so.

51.     Based on the foregoing, an actual and justiciable controversy between CRC and Western involving the Payment Bond has arisen and now exists.  CRC desires a judicial declaration that:

    i.     CRC has made a timely and proper claim against the Payment Bond;

    ii.    Western's obligation(s) under the Payment Bond have been invoked;

    iii.   Western has materially breached the Payment Bond; and

    iv.    Western is liable for all costs incurred by CRC in providing labor and materials under the Subcontract.

~~41.~~52.   The requested declaratory relief (i) would resolve the uncertainty regarding the parties' rights in relation to the Payment Bond; (ii) would resolve the corresponding controversies; (iii) would promote judicial efficiency; and (iv) very likely would avoid or significantly reduce judicial resources to address disputes between the parties herein.

## COUNT III
**BREACH OF PERFORMANCE BOND**

~~42.~~53.   Paragraphs 1 through 40~~35~~ are incorporated by reference as if set forth in full herein.

~~43.~~54.   Pursuant to the terms of the Performance Bond issued by Western, Midasco was required to perform all undertakings, covenants, terms, conditions, and agreements of the Subcontract within the time provided therein.

~~44.~~55.   The Principal on the bond, Midasco, failed to truly perform all undertakings, covenants, terms, conditions, and agreements of the Subcontract in a time provided therein and was in material breach thereof for reasons set forth above including, *inter alia,* 1) refusing or failing to provide sufficient properly skilled workers and adequate supervision; 2) failing in material respects to prosecute the work in accordance with CRC's current Schedule; 3) causing the stoppage or delay of and/or interference of the work of CRC and other contractors or subcontractors on the site; 4) failing to comply with provisions of the Subcontract and Contract Documents; and 5) abandoning its work on the Project.

~~45.~~56.   Western was provided notification of the aforementioned material breaches, Cure Notifications, Notification of Default and Notification of Default Termination of the Subcontract, and demand was made for Western to fulfill its obligations under the bond.

~~46.~~57.   Western has failed and refused to fulfill its obligations under the Performance Bond.

~~47.~~58.   As a direct and proximate result of Midasco's failure to perform all undertakings, covenants, terms, conditions, and agreements of the Subcontract within the time provided therein, and Western's failure to comply with and fulfill its obligations under the Performance Bond, CRC has incurred loss, damages, and expenses, including costs and attorneys' fees, in excess of $75,000, exclusive of interest and costs.

59.   CRC has compiled with all requirements and conditions precedent in asserting its claim under the Bond.

## COUNT IV
## BREACH OF PAYMENT BOND

60.   Paragraphs 1 through 40 are incorporated by reference as if set forth in full herein.

61. Pursuant to the terms of the Payment Bond issued by Western, Midasco was required to make payment to all persons supplying labor and material in the prosecution of the work provided for in the Subcontract.

62. CRC has provided and continues to provide labor and materials in the prosecution of the work provided for in the Subcontract and Payment Bond.

63. The Principal on the Bond, Midasco, has not made prompt payments, despite requests, to CRC for CRC's prosecution of the work provided for in the Subcontract.

64. Any person supplying labor and material in the prosecution of the work provided for in the Subcontract, including the Obligee CRC, may maintain independent actions upon the Payment Bond.

65. Western was provided notification of the aforementioned failure of Midasco to make prompt payments to CRC for costs incurred by CRC in providing labor and materials under the Subcontract.

66. Western has failed and refused to fulfill its obligations under the Payment Bond.

67. As a direct and proximate result of Midasco's failure to promptly make payment to CRC for costs incurred by CRC in providing labor and materials under the Subcontract, and Western's failure to comply with and fulfill its obligations under the Payment Bond, CRC has incurred loss, damages, and expenses, including costs and attorneys' fees, in excess of $75,000, exclusive of interest and costs.

68. CRC has compiled with all requirements and conditions precedent in asserting its claim under the Payment Bond.

**PRAYER FOR RELIEF**

WHEREFORE, Capital Rail Constructors, a Joint Venture, hereby respectfully requests judgment to be entered as follows:

1. On the Cause of Action for a declaration of the rights and obligations of CRC and Western with respect to the Performance Bond;

1.2.On the Cause of Action for a declaration of the rights and obligations of CRC and Western with respect to the Payment Bond;

2.3.Damages against Western in an amount in excess of $75,000, with the exact amount to be proven at trial;

3.4.Plaintiff's interest, costs and attorneys' fees; and

4.5. For such other and further relief as this Court may deem appropriate.

Dated:  August 10, 2017May 5, 2016                     Respectfully submitted,

CAPITAL RAIL CONSTRUCTORS, A JOINT VENTURE

By Counsel:

       /s/
Robert D. Windus (MD Bar No. 911219)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email: r.windus@mooreandlee.com

Of Counsel:

17

Robert M. Moore  
MOORE & LEE, LLP  
1751 Pinnacle Drive, Suite 1100  
McLean, Virginia 22102  
Telephone: (703) 506-2050  
Facsimile: (703) 506-2051  
Email: r.moore@mooreandlee.com